**Samuel GARY and Nancy Gary, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

Civ. A. No. 88–C–427.

United States District Court, D. Colorado.

March 20, 1989.

Charles Ramunno, Denver, Colo., for plaintiffs.

John D. Steffan, Washington, D.C., for defendant.

## ORDER

CARRIGAN, District Judge.

This action arises out of Congress' decision in 1979 to impose an excise or severance tax on the windfall profits expected to result from the gradual decontrol of oil prices in the United States. Plaintiffs Samuel and Nancy Gary commenced this tax refund action to recover a windfall profit tax that they allege was unlawfully withheld. Jurisdiction is alleged to exist pursuant to 26 U.S.C. § 7422 and 28 U.S.C. §§ 1331 and 1346.

Prior to August 30, 1979, the price of domestic crude oil sold in the United States was controlled by regulations (the "Energy Regulations") promulgated by the Department of Energy ("DOE") pursuant to the Emergency Petroleum Allocation Act of 1973. On August 30, 1979, DOE promulgated amendments to the Energy Regulations decontrolling the price of domestic crude oil produced from "qualified tertiary enhanced recovery projects." The decontrol was to provide producers an incentive to use expensive and risky tertiary recovery methods to maximize recovery from petroleum reserves by allowing producers to recoup tertiary recovery expenditures through sales of tertiary production at uncontrolled market prices. *See* Amendment to Permit Higher Prices for Tertiary Incen-

tive Crude Oil, 44 Fed.Reg. 51148 (August 30, 1979).

On February 29, 1980, the Windfall Profit Tax Act of 1979, 26 U.S.C. §§ 4986 *et seq.*, became effective. Congress passed the Act because it believed that the very substantial price increases on previously discovered oil that had resulted from phased decontrol provided an appropriate object of taxation. *See* S.Rep. No. 96–394, 96th Cong., 2d Sess. 6, reprinted in 1980 U.S.Code Cong. & Ad.News 410, 417. The Act sought to capture as tax a significant portion of the expected windfall profits. The windfall profit tax is "an excise, or severance, tax applying to crude oil produced in the United States according to its classification in one of three tiers." *Id.* at 438.

One of the types of oil that Congress sought to protect from the windfall tax through an exemption was a certain type of "tertiary" oil. Congress expressly created, in 26 U.S.C. §§ 4991(b)(4) and 4994(c), an exemption from the windfall profit tax for oil that was removed: (1) prior to October 1, 1981; and (2) from "front-end tertiary projects." Congress' purpose was to minimize the United States' dependence on foreign oil by creating a financial incentive to further recovery from such petroleum reserves.

Prior to 1980, the plaintiff Samuel Gary had acquired working interests in Bell Creek Muddy Sand Unit A in Powder River and Carter Counties, Montana ("Unit A"). In 1980, a tertiary incentive project was initiated on a portion of Unit A that was both: (1) a "qualified tertiary enhanced recovery project" under § 212.78 of the Energy Regulations; and (2) a "front-end tertiary project" under 26 U.S.C. § 4994(c)(4)(D). In addition, Unit A was a "qualified property" under 26 U.S.C. § 4994(c)(4)(C).

Certain oil attributable to Samuel Gary's working interests in Unit A was removed from Unit A after January 27, 1981, but before October 1, 1981 (the "Production"). On January 28, 1981, President Reagan issued Executive Order No. 12287 (the "Executive Order"), which accelerated the date of decontrol for all domestic crude oil prices from October 1, 1981, to January 28, 1981.

For the plaintiffs' taxable year ending December 31, 1981, the purchasers of the Production withheld a windfall profits tax on the Production (the "Withheld Amount"), and reported that tax withholding on Tax Form 6248.

On August 30, 1985, the plaintiffs filed a claim for refund seeking a refund of the Withheld Amount ($109,747) on the ground that the tax had been erroneously withheld on the Production because the Production was "front-end oil," and, therefore, was exempt from the windfall profits tax pursuant to 26 U.S.C. §§ 4991(b)(4) and 4994(c).

By letter dated March 24, 1986, the government denied the plaintiffs' claim in full, stating that "[w]e have disallowed the claim because after January 28, 1981 all domestic crude oil was decontrolled, therefore, no longer was any oil 'not subject to a first sole [sic—"sale"] ceiling price under energy regulations solely by reason of the front-end tertiary provisions of such regulations.' " The decontrol referred to in the letter is the decontrol by Executive Order of all domestic crude oil as of January 28, 1981.

Plaintiffs then commenced this action seeking refund of the Withheld Amount. Currently pending are the parties' cross-motions for summary judgment.

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Catrett* the Court held that Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

The parties agree that there are no material issues of fact in dispute. Accordingly, this case is ripe for resolution on summary judgment. The parties have briefed the issues and oral argument would not materially assist my decision.

Before addressing the parties' cross-motions for summary judgment, a review of the pertinent statutes would be helpful. Section 4986 imposes an excise tax payable by an oil producer on any windfall profit from "taxable crude oil" removed during a pertinent taxable period. "Taxable crude oil" is "all domestic crude oil other than exempt oil." 26 U.S.C. § 4991(a). Thus domestic crude oil that qualifies as "exempt oil" is not subject to the windfall profit tax.

Section 4991(b)(4) defines "exempt oil" as "any exempt front-end oil." In order to qualify as "exempt front-end oil" under 26 U.S.C. § 4994(c)(1), domestic crude oil must have been: (1) removed from the premises before October 1, 1981; and (2) "treated as front-end oil by reason of a front-end tertiary project on one or more properties each of which is a qualified property."

The parties have stipulated that the Production was removed from the premises before October 1, 1981. Thus only the second requirement of § 4994(c)(1) is at issue here. In other words, in order for the Production to qualify as exempt "front-end oil," it must have been (i) treated as "front-end oil" (ii) by reason of a "front-end tertiary project" (iii) on one or more properties each of which is a "qualified property."

The parties have agreed that the tertiary incentive project initiated on a portion of Unit A qualified as a "front-end tertiary project" under § 4994(c)(4)(D), and that Unit A was a "qualified property" under § 4994(c)(1). In addition, it is undisputed that the tertiary incentive project was a "qualified tertiary recovery project" as defined in § 212.78 of the Energy Regulations.

Accordingly, the only remaining requirement for the Production to have been "exempt front-end oil" exempt from the windfall profits tax, is that it have been "front-end oil" as defined in § 4994(c)(4)(B). Thus, the legal issue presented is whether the Production was "front-end oil" as that term is defined in § 4994(c)(4)(B).

Section 4994(c)(4)(B) provides as follows:

"The term 'front-end oil' means any domestic crude oil which is not subject to a first sale ceiling price under the energy regulations *solely* by reason of the front-end tertiary provisions of such regulations." (Emphasis added.)

In other words, "front-end oil" is domestic crude oil that except for the front-end tertiary provisions of the Energy Regulations may not under the Energy Regulations be sold at its unregulated market price.[1]

It is undisputed that the front-end tertiary provisions of the Energy Regulations permitted the Production to be sold at market prices. In addition, it is undisputed that those provisions were not the sole authority for the sale of the Production at market prices. Rather, the Executive Order also authorized the Production to be sold at market prices.

Accordingly, the government contends that the Production did not qualify "front-end oil," as that term is defined by § 4994(c)(4)(B), because it "was not subject to a first sale ceiling price *solely* by reason of the front-end tertiary provisions of the Energy Regulations." (Defendant's brief, at 9; emphasis in original).[2]

---

**1.** The "front-end tertiary provisions" are those provisions of section 212.78 of the Energy Regulations "which exempt crude oil from ceiling price limitations to provide financing for tertiary projects." 26 U.S.C. § 4994(c)(4)(A).

**2.** The government cites a service and several treatises in support of its interpretation of § 4994(c)(4)(B). *See, e.g., Crude Oil Pricing/Windfall Profit Tax Information Service,* Volume I, Newsletter and Chapters, Chapter 5, at 403 (1983) ("the front-end teritary exemption may have terminated on January 28, 1981, with decontrol [because] the oil was not exempt from price controls *solely* by reason of the front-end tertiary provisions") (emphasis in original); Bruen & Taylor, *Federal Income Taxation of Oil and Gas Investments,* at 10–17 (1983); Burke & Bowhay, *1983 Income Taxation of Natural Resources,* at 3131 (1983); *Arthur Young's Oil & Gas Federal Income Taxation,* at 649 (1986). These authorities are of course not binding; nor do I find them to be persuasive in this case.

Plaintiffs respond by asserting that the government has erroneously construed § 4994(c)(4)(B) by placing too much emphasis on the term "solely." Specifically, they assert that under the language and legislative history of § 4994(c)(4)(B), the decision of the President to decontrol all domestic crude oil prices would have no effect upon whether oil qualifies as "front-end oil."

Thus the statutory construction question presented by this case is whether because of the term "solely" in § 4994(c)(4)(B), oil that would otherwise qualify as "front-end oil" loses that status following a presidential decision to decontrol all domestic crude oil. Unfortunately, the parties have not submitted, and I am unaware, of any prior case in which this issue was considered. Significantly, "while the construction of a statute by the agency charged with administering it is entitled to deference, courts are nevertheless the final authorities on issues of statutory construction." *IRS v. Federal Labor Relations Authority,* 717 F.2d 1174, 1176 (7th Cir. 1983); *see also USDA v. Federal Labor Relations Authority,* 691 F.2d 1242, 1247 (8th Cir.1982), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 523, 78 L.Ed.2d 707 (1983).

In *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court announced certain guidelines to be followed when undertaking statutory construction. According to *Chevron,* a court must first examine the statutory provision in question to determine whether Congress had a specific intent with respect to the issue at hand. This examination should commence with the language of the statute, but the court may also inspect legislative history and past administrative practice for any light these sources may shed on congressional intent. *See Abourezk v. Reagan,* 785 F.2d 1043, 1053 (D.C. Cir.1986), *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987). The language of the statute itself is controlling if it is sufficiently clear in context, and it must prevail absent a conflict with the statute's legislative history. *Nevada Power Co. v. Watt,* 711 F.2d 913, 920 (10th Cir.1983).

After reviewing § 4994(c)(4)(B), I conclude that the meaning of the term "solely" is not sufficiently clear on its face. Clearly, the scope of "solely" is subject to at least two interpretations. Under the first interpretation, it is conceivable, as the government suggests, that oil may not qualify as "front-end oil" whenever in addition to the Energy Regulations, a statute, regulation, rule, executive order, or other authority, also authorizes the sale of the oil at market prices. In contrast, under the second interpretation, the term "solely" may be construed as only applying to the existence of other Energy Regulations that also permit the oil to be sold at market prices, and excluding any decontrol authorized by any source outside the Energy Regulations. Thus the precise meaning of the statute is not clear on its face.

Nevertheless, a second rule of statutory construction leads me to reject the government's interpretation of § 4994(c)(4)(B). Under that rule, effect must be given, if possible, to every word, clause and sentence of a statute. 2A Singer, *Sutherland Statutory Construction* § 46.06 (4th ed. 1984). "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Id. See also Abourezk, supra,* at 1054. As observed by the plaintiffs, the government's interpretation of § 4994(c)(4)(B) fails properly to consider the language that the oil not be subject to a first sale ceiling price *"under the energy regulations"* solely by reason of the front-end tertiary provisions of the Energy Regulations. As pointed out by the plaintiff's in their response brief, it is rather telling that the government chose to leave out the phrase "under the energy regulations" when referring to § 4994(c)(4)(B) on page nine of its brief.

Plaintiffs are correct in arguing that if the phrase "under the energy regulations" is afforded its proper weight, then "even after presidential decontrol, the sole reason that the Production was not subject to a first sale ceiling price *'under the energy regulations'*—i.e., within the internal pricing structure contained in the Energy Regulations—was because of the front-end ter-

tiary provisions of the Energy Regulations." (Plaintiffs' brief, at 9) (emphasis in original).[3]

Moreover, the legislative history behind the Windfall Profit Tax Act supports the plaintiff's contention that Congress did not intend for the exemption for "front-end oil" to end before October 1981. Under the Act, oil deregulated by DOE as front-end financing for tertiary recovery projects was to be taxed in "tier two" of the tax schedule. S.Rep. 96–394, *supra*, at 32. Significantly, Senate Report 96–394 states:

> "The tier two treatment for oil deregulated by DOE as front-end financing for tertiary recovery projects *applies only to the specific barrels of oil deregulated, not to any subsequent production from the property*. Thus this rule will not apply after the termination of price controls *in October 1981*." *Id.* at 35 (emphasis added), 1980 U.S.Code Cong. & Ad.News 445.

The above-quoted language evidences Congress' intent that the tax exemption for oil such as the Production be applied to certain "specific barrels of oil deregulated," and that it continue until October 1981. The Executive Order did not diminish the number of the "specific barrels" of deregulated oil that Congress sought to protect from the windfall profit tax.

The government might argue that the above-quoted reference to the "termination of price controls" actually supports its interpretation of § 4994(c)(4)(B) because it indicates Congress' intent to end the exemption for tertiary oil as soon as "the termination of price controls." However, an examination of Congress' intent in pro-

viding the exemption reveals the fallacy of this argument.

Significantly, when Congress provided the exemption for "front-end oil," such oil was already subject to price decontrol. Congress determined that windfall profit tax should not be applied to such oil because despite the decontrol of its price, "front-end oil" was still too unprofitable for producers to recover. See S.Rep. 96–394, *supra*, at 7, 1980 U.S.Code Cong. & Ad.News 418 (the windfall profit tax was "carefully structured to provide production incentives and to exempt categories of oil from which there are no windfalls from decontrol"). As mentioned, Congress considered the recovery of such oil to be necessary in order to decrease the United States' dependency on foreign oil. Thus "front-end oil" was not directly affected by President Reagan's January 27, 1981, order decontrolling the price of all domestic crude oil because the price of "front-end oil" already was decontrolled at that time.

More importantly, there is no reason to suggest that the incentive for producing "front-end oil" that Congress sought to create by exempting it from the windfall profit tax was not still needed following decontrol of all domestic crude oil. Notably, the government has not suggested the existence of any evidence demonstrating that recovery of "front-end oil" would have been any more cost efficient after January 28, 1981, than it was prior to that date.

Accordingly, for the reasons stated above, IT IS ORDERED that:

(1) Plaintiffs' motion for summary judgment is granted;

(2) Defendant's motion for summary judgment is denied;

---

3. Plaintiffs additionally argue that the legislative history behind § 4994(c)(4)(B) "confirms that the only purpose of the word 'solely' in that section was to prevent qualification for the Exemption of oil that was subject to price decontrol *both* by reason of the front-end tertiary provisions of the Energy Regulations *and* by reason of *other provisions of the Energy Regulations.*" (*Id.* at 8.) Plaintiffs add that the legislative history states that "the Exemption was to be available with respect to oil the price of which was decontrolled under the front-end tertirary provisions of the Energy Regulations unless the

oil 'could have been released from crude oil price controls *under any other part of the DOE pricing regulations.*'" (*Id.; citing* H.R.Rep. No. 817, 96th Cong., 2d Sess. 93 (1980)) (emphasis supplied by plaintiffs). Plaintiffs further state that "[w]ithout the word 'solely' in the statute, oil that was exempted from price control by the front-end tertiary provisions of the Energy Regulations and also by *other* provisions of the Energy Regulations would have qualified for the Exemption and Congress apparently did not intend that result." (*Id.*)

(3) Judgment shall be entered in favor of the plaintiffs and against the defendant in the amount of $109,747, plus interest as provided in 26 U.S.C. § 6611; and

(4) Each party shall bear his, her or its own costs.